## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Leon Segen, derivatively | ) | |
| on behalf of Intraware, Inc., | ) | |
|       Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action File No. 04-822-JJF |
| | ) | |
| Comvest Venture Partners, LP, Comvest | ) | |
| Management, LLC, Commonwealth | ) | |
| Associates Management Company, Inc., | ) | |
| Commonwealth Associates, L.P., RMC Capital, | ) | |
| LLC, Michael S. Falk, Robert Priddy, | ) | |
| Travis L. Provow, Keith Rosenbloom and | ) | |
| Intraware, Inc., | ) | |
|       Defendants. | ) | |

### AFFIDAVIT OF ROBERT N. DOKSON IN SUPPORT OF PRIDDY DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO VACATE NOTICES OF DEPOSITION, QUASH SUBPOENAS AND FOR RULE 37 COSTS AND IN SUPPORT OF PRIDDY DEFENDANTS' REQUEST FOR RULE 37 FEES AND EXPENSES

Personally appeared before the undersigned officer duly authorized to administer oaths,

Robert N. Dokson,

who, having been duly sworn, deposes and states as follows:

1.  My name is Robert Neil Dokson. I am over the age of majority and competent in all respects to provide the testimony in this Affidavit, all of which is personally known to me.

2.  This Affidavit is provided in support of the Response in Opposition of Defendants RMC Capital ("RMC") and Robert Priddy ("Mr. Priddy") (RMC and Mr. Priddy hereinafter referred to collectively as "the Priddy Defendants") to the Plaintiff's Motion To Vacate Notices of Deposition, Quash Subpoenas and For Rule 37 Costs ("the Motion To Quash") recently filed in this above-styled case by Plaintiff Leon Segen. Specifically, this Affidavit is submitted to

respond to various factual assertions contained in the Plaintiff's Local Rule 7.1.1 Statement ('the 7.1.1 Statement") and the Paul D. Wexler Affirmation ("Wexler Affirmation") filed by the Plaintiff with, and in support of, the Motion To Quash.

3.    I am a shareholder in the Atlanta, Georgia firm of Ellis, Funk, P.C. (f/k/a Ellis, Funk, Goldberg, Labovitz & Dokson, P.C.), and I am lead counsel for the Priddy Defendants in the above-styled case. I have practiced law since 1969, and I am admitted to practice before all state courts in the State of Georgia, the United States District Court for the Northern District of Georgia, the Eleventh Circuit Court of Appeals and the United States Supreme Court. I am also admitted to practice before this Court in this case pro hac vice.

4.    In nearly thirty-seven years of law practice, I have never been the subject of any disciplinary proceeding. Similarly, I have never been accused of bad faith nor of taking a frivolous litigation position, other than the allegations made by Mr. Wexler in and with respect to the Motion To Quash. As shown below and in the Priddy Defendants' Brief in Opposition To Plaintiff's Motion To Quash, the Plaintiff's contentions are devoid of merit as a matter of fact and law.

5.    In Mr. Wexler's Affirmation, and in Plaintiff's Memorandum in Support of the Motion To Quash ("Plaintiff's Brief"), Plaintiff's counsel asserts that the issue of when Plaintiff Segen or his counsel learned the details of the matching transactions at issue in this case is irrelevant for statute of limitations and equitable tolling purposes, because "the question of when the limitations period begins to run is triggered by the issuer's (i.e. Intraware's) knowledge of the facts supporting the claim, not a shareholder's knowledge and certainly not the knowledge of a shareholder's lawyer." See Wexler Affirmation at 3; see also Plaintiff's Brief at 5. Plaintiff's counsel is incorrect and ignores the precise language of a seminal case on which he relies for his

2

equitable tolling claim, <u>Litzler v. CC Investments, Ltd.</u>, 362 F. 3d 203 (2nd Cir. 2004). In <u>Litzler</u>, the Second Circuit held that where (as here) an alleged insider does not file a Form 4 with the SEC, the running of the two (2) year limitation period is tolled or suspended only until:

> "[T]he <u>claimant</u> or (depending upon the circumstances) the company gets actual notice that a person subject to Section 16(a) has realized specific short-swing profits that are worth pursuing."

<u>Id</u>. at 208 (emphasis added). This language clearly establishes that the timing of the <u>claimant's</u> (i.e., Mr. Segen's) knowledge regarding the facts at issue is highly relevant, perhaps determinative.

      6.     Mr. Segen testified that, except for the fact that he purchased the Intraware stock, he had virtually no substantive knowledge regarding the facts of this case, including those relating to the equitable tolling issue, but he believed his attorneys had such knowledge. <u>See</u> discussion <u>infra</u> at ¶ 7. If Mr. Segen's attorneys possessed such knowledge, (as, for example, knowledge regarding the facts of the underlying transactions), then as a matter of well-established law, that knowledge by counsel is imputed to the client, Mr. Segen. <u>See</u> <u>Smith v. Ayer</u>, 101 U.S. 320, 25 L. Ed 955 (1880); <u>Owens v. Lac D'Amiante Du Quebec, Ltee.</u> 656 F. Supp. 981, (E.D. Pa. 1987), <u>aff'd without opinion</u>, 833 F. 2d 305 (1987). <u>Owens</u>, like the instant case, involved a statute of limitations issue in which the statute began to run when the plaintiff knew or should have known certain facts. While the plaintiff in <u>Owens</u> did not possess the requisite knowledge, his attorney clearly did. The trial court therefore dismissed the claim on statute of limitations grounds, finding that a client "is considered to have notice of all facts, notice of which can be charged upon the attorney." <u>Id</u>: at 983 (citations omitted). The Third Circuit affirmed the dismissal without opinion. Thus, Plaintiff's counsel's assertions that Mr. Segen's attorneys' knowledge is <u>not</u> imputed to Mr. Segen misstates applicable law. Since the

issue of when claimant had actual notice of a short-swing profit claim is important for statute of limitation purposes, and since the attorneys' knowledge is imputed to the client, I believe that it is crucial for Defendants to discover when counsel first obtained this knowledge.

7.     Plaintiff further argues that the Motion To Quash should be granted because Mr. Segen was questioned in his deposition at great length concerning the merits of the case in general and the statute of limitations defense in particular.  Plaintiff's Brief at 2.  It is true that Mr. Segen was questioned at length, but it is equally true that, with the exception of testimony regarding his purchase of the Intraware stock, Mr. Segen was able to provide absolutely no substantive testimony regarding any facts in this case.  A complete mini-script copy of Mr. Segen's deposition transcript is attached to this Affidavit as Exhibit "A" for the Court's review. The following partial summary of Mr. Segen's testimony reveals his utter lack of knowledge on virtually every factual issue in this case:

(i)     As to whether any Defendants other than Comvest Venture Partners, LP, ("Comvest") and Robert Priddy engaged in matching transactions, Mr. Segen does not know, but "I hope my attorneys" know.  (Segen depo. at 14-15, 131-132);

(ii)    As to whether there were any transactions besides those listed in Paragraph 31 of the Complaint for which profits should be disgorged, Mr. Segen had no knowledge "but [my counsel] might"  (Segen depo. at 54-57);

(iii)   As to when he learned the details of the transactions outlined in Paragraph 31 of the Complaint and in the demand letter, Mr. Segen testified he has no knowledge when he learned these details (Segen depo. at 78), and only his counsel would know when counsel learned these details (Segen depo. at 79);

(iv)    As to whether Mr. Segen (a lawyer) has an obligation to make sure that things are factually correct which are submitted to the Court, "...the only information I have is that I purchased the stock." (Segen depo. at 116);

4

(v)     As to the issue of what was factually incorrect in various requests to admit propounded to Mr. Segen, which were denied by him, Mr. Segen testified that "I have no knowledge regarding any of these." Segen depo. at 118. However, "my attorneys might have information." (Segen depo. at 123).

In summary regarding the state of Mr. Segen's knowledge, Mr. Segen testified that:

"[p]ersonally, and without the benefit of conversations with counsel, all that I know is that I went and bought the Intraware stock for trading purposes. That's all that I know." (emphasis added).

Segen depo. at 136. Mr. Segen went on to say that it would be a waste of time to question him about the factual allegations in the Complaint paragraph by paragraph because he has no knowledge of the factual basis for the allegations other than what he learned from counsel. Segen depo. at 138-139.

This testimony by Mr. Segen, establishing his complete lack of substantive knowledge, refutes any contention by Plaintiff that Mr. Segen's deposition testimony is all the discovery that the Defendants need.

8.      Plaintiff in the Motion To Quash similarly suggests that the subpoenas for counsel were improper because the documents sought 'had already been the subject of a Rule 34 request to the Plaintiff." Wexler Affirmation, ¶ 3. It is true that the documents sought in the subpoenas are essentially the same documents previously sought from the Plaintiff in the Priddy Defendants' First Request for Production of Documents. See Exhibit "B". What Plaintiff failed to state, however, is that in response to the Rule 34 document request, Mr. Segen produced a grand total of two (2) pages, producing only the trade confirmation for his purchase of the Intraware stock. See Exhibit "C". Mr. Segen produced no documents related to or supportive of the group allegations in the Complaint (Document Request No. 3), nor any documents related to the equitable tolling claim, i.e., documents indicating "when and how Plaintiff or his

5

representatives learned of the transactions described in Paragraph 31 of the Complaint."
(Document Request No. 5).

While Mr. Segen himself may not have had physical possession of the requested documents, if his counsel does, these documents are subject to production pursuant to F.R.C.P. Rule 34. See Mercy Catholic Medical Center v. Thompson, 380 F. 3rd 142, 160 (3rd Cir. 2004); Poole v. Textron, Inc., 192 F.R.D. 494, 501 (D. Md. 2000). And, to the extent Plaintiff may attempt to argue that otherwise responsive documents in counsel's possession are privileged, any such claim of privilege was waived as a matter of law by Plaintiff's failure to assert timely objections to the Rule 34 request for production.[1]/ See Rohm and Haas Company v. Brotech Corp., 1990 U.S. Dist LEXIS 20117 (D. Del. 1990) (" that untimely objections to interrogatories or document production requests are waived, even if the information or material sought is privileged [citations omitted]…has long been the rule in this Court." ); Id. at 13-14. See also Applied Biosystems, Inc. v. Cruachem, Inc., 1990 U.S. Dist. LEXIS 21003 (D. Del. 1990).

9.    Defendants are aware of at least one important category of documents responsive to Document Request No. 5 (when and how Plaintiff or his representatives learned of the transactions set out in Paragraph 31 of the Complaint). This category would be the time records of Plaintiff's counsel. See Category No. 5 of the Subpoenas. See also Affidavit of Steven R. Paradise, Esq., filed simultaneously with this Affidavit.

10.    Mr. Wexler has asserted that the subpoenas and the Notices "are not interposed for any proper purpose but simply to harass your adversaries in this litigation and to cause

---

[1]/ The Rule 34 request was served via hand delivery on August 29, 2005 along with a Request to Admit. The docket in this case will show that Plaintiff served a response to the Request To Admit on October 3, 2005, but only later served an untimely response to the Request to Produce on October 26, 2005. The two pages of documents actually produced were handed to the Priddy Defendants' counsel during Mr. Segen's deposition on November 1, 2005.

unnecessary costs and expenses." See Wexler February 13, 2006 letter, Exhibit "B" to the

Motion To Quash. This assertion is patently incorrect for several reasons, to wit:

> (i)     This Court has already stated that factual issues exist requiring discovery, at least as to the equitable tolling claim. See Memorandum Opinion on Motion To Dismiss at 8;

> (ii)     Mr. Segen was himself unable to testify to the facts underlying the equitable tolling claim (or to any other factual issues except that he purchased the Intraware stock), but as to numerous questions he thought his counsel possessed the requested information. (See discussion supra at ¶ 7);

> (iii)     The costs and expenses to be incurred by virtue of the Priddy Defendants' counsel having to undertake a (second) trip to New York to depose Mr. Segen's counsel will be much greater for the Priddy Defendants than for Mr. Segen's counsel. The Priddy Defendants will incur travel time and travel and hotel expenses which will not be incurred by Plaintiff or his counsel. It is counterintuitive to argue that the Priddy Defendants are seeking to harass Plaintiff and cause unnecessary trouble and expense, when the cost and expense to Plaintiff for these depositions will be minimal compared to that required of the Priddy Defendants.

11.     Even though the Priddy Defendants believed from the outset that they had a right

to depose Plaintiff's counsel, they sought to avoid this dispute in several different ways if they

could have otherwise obtained the necessary factual information. Thus, the Priddy Defendants

first agreed to suspend the original notices to counsel after Plaintiff's counsel objected, instead

first agreeing to take Mr. Segen's deposition and see if he could provide the requisite factual

information.[2]/ See Exhibit "D" attached hereto. When Mr. Segen was unable to testify

substantively, Defendants' counsel then proposed a factual stipulation -- limited solely to the

equitable tolling issue – as a way to avoid counsels' depositions. However, Plaintiff's counsel

---

[2]/ The Priddy Defendants had initially issued deposition notices for Mr. Segen, Mr. Wexler and Mr. Ostrager, to be completed in one trip to New York.

stated that they could not stipulate to having learned the information in the demand letter to Intraware and in Paragraph 31 of the Complaint at any time prior to July 5, 2002 (the date of the demand letter) because they had no time records to show this fact. See Paradise Affidavit. Consequently, Defendants were left with no choice but to pursue these depositions, to test under oath, inter alia, the contentions regarding when Plaintiff's counsel learned the information crucial to the equitable tolling issue.

12.    Given (i) the lack of substantive testimony by Mr. Segen, (ii) the failure of Plaintiff to produce any documents except the two (2) page Intraware trade confirmation, and (iii) the Court's previous determination that "further development of the facts" is required through discovery, I as lead counsel for the Priddy Defendants, know of no way to develop key relevant facts other than by proceeding with the depositions of Plaintiff's counsel. Thus, the issuance of the subpoenas and Notices of Deposition to Plaintiff's counsel is not for purposes of harassment or any other improper purpose, but solely to obtain through discovery important and relevant factual information, information which the Plaintiff could not provide.

13.    I believe that the Motion To Quash is not substantially justified for all of the reasons set forth herein. The Priddy Defendants have incurred, and will incur, substantial fees and expenses as a result of the Plaintiff's counsels' refusal to be deposed. Such fees and expenses include: (i) those related to opposing the Motion To Quash; and (ii) those related to the requirement of a second trip to New York which would not have been necessary if Plaintiff counsel had not initially refused to be deposed when Mr. Segen was deposed. For these reasons, the Priddy Defendants request an award of fees and expenses be issued in their favor, pursuant to F.R.C.P. Rules 26(c) and 37(a)(4).

Further Affiant Sayeth Not.

This _____ *17ᵀᴴ* _____ day of _____ *March* _____, 2006

*Robert N Dokson*

Robert N. Dokson, Esq. ("Affiant")

Sworn to and subscribed before me
this *17ᵀᴴ* day of *March*, 2006.

*Geneva Green*

NOTARY PUBLIC
My commission expires: *02/28/2009*



K:\CLIENTS\Robbie\Priddy\Priddy - Segen v. Delaware Securities Suit\Pleadings\Affidavit of Robert N. Dkson, Esq. In Response To Plaintiff's Local Rule 7.1.1.doc

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE

2    -----------------------------------X
3    LEON SEGEN, derivatively on behalf
     of Intraware, Inc.,
4
                    Plaintiff,
5
                                    Civil Action
         vs.                        No. 04-822-JJF
6
     COMVEST VENTURE PARTNERS, LP,
7    COMVEST MANAGEMENT, LLC,
     COMMONWEALTH ASSOCIATES MANAGEMENT
8    COMPANY, INC., COMMONWEALTH
     ASSOCIATES, L.P., RMC CAPITAL,
9    LLC, MICHAEL S. FALK, ROBERT
     PRIDDY, TRAVIS L. PROVOW, KEITH
10   ROSENBLOOM and INTRAWARE, INC.,
11                  Defendants.
     -----------------------------------X
12
13
14
15            DEPOSITION OF LEON SEGEN
16              New York, New York
17            Tuesday, November 1, 2005
18
19
20
     Reported by:
21   WENDY D. BOSKIND, RPR
     JOB NO. 5268
22
23                     EXHIBIT
24                      "A"
25                     56 pp

Page 2

1
2
3
4        November 1, 2005
5        10:57 a.m.
6
7
8        Deposition of LEON SEGEN, held
9    at the offices of Ostrager Chong
10   Flaherty & Broitman P.C., 250 Park
11   Avenue, New York, New York, pursuant
12   to Notice, before Wendy D. Boskind,
13   a Registered Professional Reporter
14   and Notary Public of the State of
15   New York.
16
17
18
19
20
21
22
23
24
25
        TSG Reporting - Worldwide    212-702-9580

Page 3

1
2    A P P E A R A N C E S :
3
4    OSTRAGER CHONG FLAHERTY & BROITMAN P.C.
5    Attorneys for Plaintiff
6       250 Park Avenue
7       Suite 825
8       New York, New York 10177-0899
9    BY:  GLENN F. OSTRAGER, ESQ.
10
11
12   ELLIS, FUNK, GOLDBERG, LABOVITZ
13   & DOKSON, P.C.
14   Attorneys for Defendants
15   RMC Capital, LLC and Robert Priddy
16      One Securities Centre
17      Suite 400
18      Atlanta, Georgia 30305
19   BY:  ROBERT N. DOKSON, ESQ.
20
21
22
23
24
25
        TSG Reporting - Worldwide    212-702-9580

Page 4

1
2    L E O N   S E G E N ,
3       business address at 10 East 40th
4       Street, 46th Floor, New York, New
5       York 10016, having been first duly
6       sworn by the Notary Public, (Wendy D.
7       Boskind), was examined and testified
8       as follows:
9
10      MR. DOKSON:  This will be the
11   deposition of Plaintiff, Leon Segen,
12   taken by Defendants, Robert Priddy
13   and RMC Capital, LLC, in the above-
14   styled case.  The deposition is taken
15   pursuant to notice.  It is taken for
16   all purposes permitted by the Federal
17   Rules of Civil Procedure, including
18   discovery and cross-examination.  All
19   objections as to sufficiency of the
20   notice are waived.
21      Is that agreeable, Glenn?
22      MR. OSTRAGER:  That's agreeable.
23      MR. DOKSON:  And all objections
24   will be reserved for use at the time
25   of hearing or trial except for
        TSG Reporting - Worldwide    212-702-9580

Page 5

1
2    objections as to the form of the
3    question or responsiveness of the
4    answer.
5       Is that agreeable?
6       MR. OSTRAGER:  It's agreeable.
7       MR. DOKSON:  Okay.  We would
8    like to have Mr. Segen read and sign
9    this transcript.  He can do so, as
10   far as we are concerned, before any
11   notary public in the State of
12   New York.
13
14   EXAMINATION BY
15   MR. DOKSON:
16      Q.  Mr. Segen, have you ever been
17   deposed before?
18      A.  Yes.
19      Q.  So you have an idea of what we
20   are going to do here today?
21      A.  Oh, yes.
22      Q.  I am going to ask you a series
23   of questions which I believe are related
24   to issues in this case and, when I do so,
25   I would like you to give me as full and
        TSG Reporting - Worldwide    212-702-9580

Page 6

Segen

1
2  complete a response as you can based on
3  your knowledge and understanding.
4        Is that agreeable?
5    A.  Yes, it is.
6    Q.  Sometimes I have a tendency to
7  ask a question which I think is clear but
8  the witness doesn't always agree and
9  doesn't understand it.  So, if that
10 happens, rather than guessing at my
11 meaning, will you tell me you don't
12 understand and ask me to rephrase the
13 question?
14   A.  Certainly.
15   Q.  So then we will know, if you
16 answer, that we have gotten an answer to a
17 clearly-understood question; is that
18 correct?
19   A.  To the best of my ability.
20   Q.  Okay.  And one more ground rule,
21 for the court reporter, I will make you a
22 deal, I will try not to ask the next
23 question until you finish your answer and
24 if you will not answer until I finish my
25 question, so only one of us speaks at a

TSG Reporting - Worldwide    212-702-9580

Page 7

Segen

1
2  time.
3        Is that agreeable?
4    A.  Yes, I will try to match your
5  level of courtesy.
6    Q.  State your full name for the
7  record, please?
8    A.  Leon S. Segen.
9    Q.  Does the middle initial stand
10 for something?
11   A.  It's always been an
12 embarrassment to me, Sheldon.
13   Q.  And how old are you?
14   A.  Oh, getting personal, I am going
15 to object (smiling) -- 57.
16   Q.  Leon, I just had my 65th
17 birthday.
18   A.  You certainly don't look it.
19   Q.  You are just a youngster.
20        Are you currently employed?
21   A.  Yes.
22   Q.  By whom?
23   A.  Myself, Offices of Leon Segen.
24   Q.  And I didn't catch the business
25 address before.  Where is that?

TSG Reporting - Worldwide    212-702-9580

Page 8

Segen

1
2    A.  10 East 40th Street, 46th floor,
3  New York City.
4    Q.  You are a sole practitioner?
5    A.  Yes.
6    Q.  And how long have you worked as
7  a sole practitioner?
8    A.  About ten years.
9    Q.  Whom did you work with before
10 that?
11   A.  Scarinci Hollenbeck, in
12 New Jersey.
13   Q.  What kind of practice do you
14 have?
15   A.  It's a general, primarily
16 commercial, a bit of negligence.
17   Q.  It's a litigation practice?
18   A.  Mm-hmm -- yes.
19   Q.  It was the same when you were at
20 Scarinci Hollenbeck?
21   A.  Yes.
22   Q.  Are you married?
23   A.  No.
24   Q.  Have you ever been married?
25   A.  No.

TSG Reporting - Worldwide    212-702-9580

Page 9

Segen

1
2    Q.  Do you have a military
3  background?
4    A.  No.
5    Q.  Have you ever been a plaintiff
6  or a defendant in any lawsuits besides
7  this one?
8    A.  Yes.
9    Q.  Okay.  Let's break this down to
10 securities-type cases and non-securities
11 cases.
12        I am going to ask you now just
13 about non-securities litigation, because I
14 am going to ask you later about securities.
15        Have you ever been a plaintiff
16 or a defendant in any non-security cases?
17   A.  Yes.
18   Q.  On approximately how many
19 occasions?
20   A.  Once.
21   Q.  Tell me about that case.
22   A.  I was a plaintiff in a
23 negligence case.  I tripped, and over by a
24 gas station and a car wash.
25   Q.  How did that case come out?

TSG Reporting - Worldwide    212-702-9580

Page 10

```
1              Segen
2    A.  Favorably.
3    Q.  Was it tried?  Was it settled?
4    A.  It was settled.
5    Q.  And that's the only non-
6  securities case that you can recall?
7    A.  Yeah.
8    Q.  Okay.  Now, as a litigator, you
9  are not going to take offense at this next
10 question.
11         Other than minor traffic
12 violations, have you ever been either
13 charged or convicted of any criminal
14 violation?
15   A.  No.
16   Q.  The state of your health today,
17 I take it, is good?
18   A.  Adequate.
19   Q.  You haven't had any alcohol to
20 drink yet today; have you?
21   A.  Not today.
22   Q.  And you are not taking any drugs
23 that would affect your ability to focus
24 here today?
25   A.  No.
```
TSG Reporting - Worldwide   212-702-9580

Page 11

```
1              Segen
2    Q.  And I take it there is nothing
3  else that's going on today that would
4  affect your ability to focus on the
5  matters at hand.
6    A.  Correct.
7        MR. DOKSON:  Wendy, mark this,
8  please, as 4.
9        (Deposition Defendants' Exhibit
10 P.R. 4, Defendant Robert Priddy and
11 RMC's First Request for Production of
12 Documents to Plaintiff, marked for
13 identification, as of this date.)
14   Q.  Mr. Segen, let me show you a
15 document that our reporter has marked as
16 Priddy Exhibit Number 4.  It is Defendant
17 Robert Priddy and RMC's First Request for
18 Production of Documents to Plaintiff.
19       Have you ever seen this document
20 before?
21   A.  I don't believe so.
22   Q.  So, then — I'm sorry.  Look, if
23 you would, please, sir, on Exhibit A,
24 which is immediately following page 5.
25 There are five documents requested.
```
TSG Reporting - Worldwide   212-702-9580

Page 12

```
1              Segen
2        Did you gather the documents in
3  response to Request Number 1?
4    A.  (Pause.)
5        Where is Exhibit F?
6    Q.  You will see.  Look at page 5,
7  and then right after — page 5 is the
8  second signature page, and then Exhibit A,
9  Documents Requested.  You are looking at
10 it.
11   A.  Yeah, but it refers to Exhibit
12 F.
13   Q.  Oh, I'm sorry.
14   A.  "a copy of which is attached as
15 Exhibit "F" to the Defendants' Robert
16 Priddy's and RMC Capital, LLC's First
17 Request for Admissions".
18   Q.  Let me help you out on that.
19       MR. DOKSON:  Okay, Wendy, mark
20 this as Priddy 2, P.R. 2.
21       (Deposition Defendants' Exhibit
22 P.R. 2, Defendants Robert Priddy's
23 and RMC Capital, LLC's First Request
24 For Admissions To Plaintiff Leon
25 Segen, marked for identification, as
```
TSG Reporting - Worldwide   212-702-9580

Page 13

```
1              Segen
2  of this date.)
3    Q.  Exhibit F is about eight, ten
4  pages from the rear.
5    A.  Okay. (Pause.)
6        I don't know, I guess maybe I
7  just don't understand what could possibly
8  be called for by Exhibit F, number one, or
9  that I might have.
10       MR. OSTRAGER:  Why don't you
11 answer "Yes" or "No".
12   Q.  So the answer is you didn't
13 gather any such documents.
14   A.  I don't believe I have any such
15 documents.
16   Q.  And with respect to Request
17 Number 2, are those the documents, that
18 you came in with today, are those the only
19 ones that are responsive to Request Number
20 2?
21   A.  (Pause.)
22       Yes.
23   Q.  How about Request Number 3, did
24 you gather any documents responsive to
25 Request Number 3?
```
TSG Reporting - Worldwide   212-702-9580

Page 14

Segen

1
2    A.  (Pause.)
3        No.
4    Q.  Are you aware of any such
5    documents?
6    A.  No.
7    Q.  So you don't have any?
8    A.  No.
9    Q.  Do you know if your counsel have
10   any such documents?
11   A.  I suspect that they do.
12   Q.  Do you know if those documents
13   were produced?
14   A.  I haven't -- I don't know.
15   Q.  Did you gather any documents in
16   response to Request Number 4?
17   A.  (Pause.)
18       No.
19   Q.  Are you aware of whether any
20   such documents exist?
21   A.  I believe they do.
22   Q.  So you believe that there were
23   Defendants other than ComVest Venture
24   Partners, LP and Robert Priddy who engaged
25   in matching transactions?

TSG Reporting - Worldwide    212-702-9580

Page 15

Segen

1
2    A.  I wouldn't know.
3    Q.  Who would know that, sir?
4    A.  I hope my attorneys.
5    Q.  Are you aware that you made such
6    allegations -- I'm sorry, strike that.
7        Did you gather any documents in
8    response to Request Number 5?
9    A.  (Pause.)
10       No.
11   Q.  Do you know if any such
12   documents exist?
13   A.  I am sure they do.
14   Q.  And, when you say you are "sure
15   they do", on what basis do you say you are
16   sure they exist?
17   A.  Based on conversations that I
18   have had with counsel.
19   Q.  What documents exist?
20   A.  Everything that I know is based
21   on attorney/client talks, conversations.
22   Q.  I certainly don't want you to
23   tell me conversations you have had with
24   counsel, because I don't think that that
25   has been waived, but I do believe that

TSG Reporting - Worldwide    212-702-9580

Page 16

Segen

1
2    privilege has been waived with regard to
3    documents, since there were no responses
4    filed in response to Rule 34 timely, so I
5    would like you to tell me the existence of
6    any documents.
7        MR. OSTRAGER:  I am not going to
8    engage in a debate with you on the
9    record --
10       MR. DOKSON:  I understand.
11       MR. OSTRAGER:  -- as to whether
12   there was a waiver or not.  It's our
13   position that the privilege fully
14   attached.  I think the witness has
15   testified that he doesn't -- he is
16   not aware of documents.
17       MR. DOKSON:  Well, I will tell
18   you on the record, however, that I do
19   believe that there is an issue that
20   the privilege has been waived by
21   failure to respond timely and --
22       MR. OSTRAGER:  We --
23       MR. DOKSON:  Let me just finish.
24       -- and, furthermore, if there
25   are documents in his counsel's

TSG Reporting - Worldwide    212-702-9580

Page 17

Segen

1
2    possession, I think those are producible,
3    as well --
4        MR. OSTRAGER:  Okay.
5        MR. DOKSON:  -- without respect
6    to privilege.
7        MR. OSTRAGER:  Okay.  We are
8    here today to answer your questions,
9    we are not here to engage in debate.
10       Plaintiff responded to the
11   document requests (indicating) and
12   produced and identified all documents
13   that were responsive, so there are no
14   documents other than what have been
15   identified in response to your
16   requests.
17       Mr. Segen has arrived today and
18   brought a trading confirmation, and
19   it's our position that we fully
20   responded to your requests.  And,
21   with respect to your assertion there
22   is a waiver of some privilege, you
23   can maintain whatever position you
24   like, but that's not an issue to be
25   addressed today.

TSG Reporting - Worldwide    212-702-9580

Page 18

```
1              Segen
2       MR. DOKSON:  Well, Mr. Segen has
3   told me that he believes there are
4   documents responsive to Request
5   Number 5.  The only documents that
6   have been produced, unless I am
7   missing something, are these two
8   pages here in front of you .
9       MR. OSTRAGER:  I don't believe --
10  all he said is he believes counsel
11  produced whatever exists, and you can
12  characterize it as you like, but
13  let's move on.
14      MR. DOKSON:  Okay.
15      Q.  Mr. Segen, what did you do to
16  prepare for this deposition?
17      A.  I called up Charles Schwab and
18  asked them to send me a copy of my purchase
19  of Intraware.
20      Q.  Anything else?
21      A.  I briefly spoke to counsel
22  regarding the deposition.
23      Q.  To your knowledge, have any
24  documents that were requested in the
25  request to produce been withheld on the
```
TSG Reporting - Worldwide   212-702-9580

Page 19

```
1              Segen
2   basis of a claim of privilege?
3       A.  I wouldn't know.
4       Q.  And who would know that?
5       A.  I would think counsel would
6   know, but, you know, that's just my hunch.
7       MR. OSTRAGER:  I would ask the
8   witness not to speculate.  Either you
9   know or you don't know.
10      A.  As a matter of fact, I don't
11  know.
12      MR. DOKSON:  Glenn, I would ask
13  that if any documents have been
14  withheld on the basis of a claim of
15  privilege that we get a privilege
16  log.
17      (REQUEST.)
18      MR. OSTRAGER:  Okay.
19      MR. DOKSON:  You can tell me if
20  any have been withheld.
21      MR. OSTRAGER:  No documents have
22  been withheld on a claim of grounds
23  of privilege.
24      MR. DOKSON:  So the only
25  documents at all that are responsive
```
TSG Reporting - Worldwide   212-702-9580

Page 20

```
1              Segen
2   are these two pieces of paper right
3   there, (indicating).
4       MR. OSTRAGER:  We reserve our
5   right to assert that our work product
6   is privileged, and we reserve the
7   right to withhold from production any
8   information that's subject to
9   privilege.  I believe we fully
10  responded to your document requests.
11  If we determine that a privilege log
12  is appropriate, we will provide you
13  with one.
14      MR. DOKSON:  When will you
15  determine that?
16      MR. OSTRAGER:  I have not
17  provided you with a privilege log, I
18  do not believe one is appropriate.
19  If, upon further review at any later
20  date, we determine that it's
21  appropriate for us to supplement on
22  discovery responses pursuant to the
23  federal rules, we will supplement on
24  discovery responses.
25      MR. DOKSON:  Well, we will have,
```
TSG Reporting - Worldwide   212-702-9580

Page 21

```
1              Segen
2   after this deposition, a good-faith
3   conference before there is a motion
4   filed either on the question of
5   getting a privilege log so we can
6   determine whether or not we want to
7   proceed to move to compel or to move
8   to compel.
9       MR. OSTRAGER:  That's fine, and
10  we have responded to your document
11  requests.  You can take whatever
12  action you deem appropriate.
13      Q.  Mr. Segen, how long have you
14  been investing in publicly-traded
15  securities?
16      A.  About 20 years.
17      Q.  Do you consider yourself a
18  sophisticated or experienced investor?
19      A.  Yes.
20      Q.  I know that a lot of brokerage
21  houses have profiles where they ask people
22  to characterize themselves as
23  "experienced" or "inexperienced".  How do
24  you characterize yourself?
25      A.  "Experienced."
```
TSG Reporting - Worldwide   212-702-9580

Page 22

Segen

1
2     Q.  Do you generally rely on your
3  own decisions in making investment
4  decisions or do you generally invest in
5  either funds managed by someone else or
6  acting on the advice of a professional
7  manager?
8     A.  The first and third, my own and
9  professional managers.  I also do some
10  mutual funds -- I guess the answer is all
11  three.
12     Q.  Let me go back.  I left one
13  background area that I should have asked
14  for.
15        Tell me a little bit about your
16  educational background.
17     A.  How far back do you want me to
18  go?
19     Q.  Since you left high school.
20     A.  Okay.  Undergraduate degree from
21  City College, in 1970.  A master's degree
22  from NYU, in history, in 1972.  Graduate
23  studies in legal history, on intellectual
24  history, at Stony Brook.  And then law
25  school at Cardozo law, 1979.

TSG Reporting - Worldwide   212-702-9580

Page 23

Segen

1
2     Q.  And were you with Scarinci
3  Hollenbeck from the time you left Cardozo
4  until you went to --
5     A.  No.
6     Q.  Who were you with?
7        Give me your legal history.
8     A.  I started out with the Brooklyn
9  District Attorney's office.  Then I went
10  to the Manhattan's District Attorney's
11  office.  Then I was a special prosecutor
12  for the Attorney General's office in New
13  York State.  Then I went to Lowenstein
14  Sandler as an associate.  And then I was
15  head of litigation at Scarinci Hollenbeck,
16  until I started my own practice.
17     Q.  Now I want to ask you about 16(b)
18  and other securities cases.
19        Have you ever been a plaintiff
20  or a defendant in any security cases?
21     A.  Yes.
22     Q.  And have you ever been a
23  defendant?
24     A.  No.
25     Q.  On how many occasions have you

TSG Reporting - Worldwide   212-702-9580

Page 24

Segen

1
2  been a plaintiff?
3     A.  I am not sure.  I think about
4  two.
5     Q.  What was the style or the name
6  of the first case, Segen versus?
7     A.  I forgot.
8     Q.  Do you remember any of the
9  Defendants?
10     A.  Not by name, no.
11     Q.  Who would have the -- do you
12  have any paperwork on that case?
13     A.  I don't think I have retained
14  any.
15     Q.  Do you remember who represented
16  you in that case?
17     A.  Ostrager, (indicating Mr. Ostrager)
18  and Wexler.
19     Q.  When was that case?
20     A.  I don't recall dates.
21     Q.  Anything that would refresh your
22  recollection?
23     A.  Not in my possession.
24     Q.  Pardon me?
25     A.  Not in my possession.

TSG Reporting - Worldwide   212-702-9580

Page 25

Segen

1
2     Q.  No, anything, not necessarily
3  documents, anything at all that would
4  refresh your recollection as to when those
5  cases were.
6     A.  Perhaps, I don't know --
7  wouldn't know until I saw it.
8     Q.  Where was the case pending?
9     A.  I believe the cases were in
10  New York, but I am not sure.
11     Q.  Southern District of New York?
12     A.  I am not positive, I believe so.
13     Q.  Were you ever -- this, we are
14  talking about the first case, you told me
15  you thought there were two.
16     A.  I believe there are two.
17     Q.  Okay, I want to ask you about
18  the one you think was the first case.
19        Did you ever testify by
20  deposition or otherwise?
21     A.  No.
22     Q.  Do you remember who opposing
23  counsel --
24     A.  Actually, I must tell you, I am
25  not even sure if a complaint was brought

TSG Reporting - Worldwide   212-702-9580

Page 26

Segen

1
2  in those cases, I am not sure how far they
3  went.  I have no recollection at this
4  time.
5      Q.  You think that perhaps there was
6  just a demand made but no complaint
7  actually filed?
8      A.  Perhaps.
9      Q.  Again, that's something you
10  don't have information on, but you think
11  Mr. Ostrager would know?
12      A.  Probably, I am not sure.
13      Q.  And, presumably, if Mr. Ostrager
14  is a careful attorney, which I am sure he
15  is, he would have files on those cases, do
16  you think?
17      A.  That's beyond my province.
18      Q.  Okay, you just don't know that.
19      A.  I don't know.  I don't know what
20  Mr. Ostrager has in his possession.
21      Q.  Does the name Judge Pauley mean
22  anything to you?
23      A.  No.
24      Q.  You never heard of Judge Pauley?
25      A.  I don't believe so.

TSG Reporting - Worldwide    212-702-9580

Page 27

Segen

1
2      Q.  Does the name Westcliff mean
3  anything to you?
4      A.  No.
5      Q.  You never heard of Westcliff?
6      A.  I may have but, at the moment, I
7  don't recall.
8          Same for the other -- same for
9  Pauley.
10      Q.  Do you practice much in the
11  Southern District?
12      A.  Not that -- not too much.
13      Q.  Are you aware that you were a
14  Plaintiff in a case in the Southern
15  District against -- before Judge Pauley
16  against Westcliff?
17      A.  Don't recall.
18      Q.  You just don't recall.
19          Do you know if you authorized
20  such a lawsuit?
21          MR. OSTRAGER:  I would object,
22  because the witness has testified he
23  doesn't recall the matter you are
24  referring to.
25          MR. DOKSON:  Objection is noted.

TSG Reporting - Worldwide    212-702-9580

Page 28

Segen

1
2      Q.  You can answer the question.
3      A.  Well, maybe if you gave me a
4  paper to refresh my recollection, I would
5  be able to tell you but, you know, at the
6  moment I really can't answer that
7  question.
8      Q.  Are you aware that the case
9  before Judge Pauley was settled?
10      A.  Which case was it?
11      Q.  The Westcliff case.
12      A.  Can you give me the names of all
13  the Defendants?
14      Q.  I don't have all the Defendants
15  here.
16      A.  No, the name Westcliff doesn't
17  ring a bell for me, but I may know it
18  under some other name.
19          Do you have any papers that I
20  could look at.
21      Q.  I don't.
22          MR. DOKSON:  Do you have a copy
23  of the opinion?
24          MR. OSTRAGER:  I don't have a
25  copy of an opinion.

TSG Reporting - Worldwide    212-702-9580

Page 29

Segen

1
2      I'll tell you what, you can ask
3  your questions, and you can answer
4  them, and I will object if I deem it
5  appropriate.
6          MR. DOKSON:  Fine.
7      Q.  So as you sit here today,
8  Mr. Segen, you don't remember the
9  Westcliff case?
10      A.  Not by that name.
11      Q.  Have you ever been involved in
12  any case where a notice of appeal was
13  filed to the Second Circuit?
14      A.  Excuse me?
15      Q.  Have you ever been involved in a
16  case where a notice of appeal was filed to
17  the Second Circuit?
18      A.  I don't recall.
19      Q.  How about the second case that
20  you talked about?
21      A.  Just remember, I am not sure
22  about the number of cases and whether any
23  were ever brought to complaint stage, I
24  have no recollection --
25      Q.  Let's back up.

TSG Reporting - Worldwide    212-702-9580

Page 30

Segen

1
2    A.  -- so --
3    Q.  I think you testified that you
4    can recall two cases, either of one or
5    none of which came to the complaint stage.
6    Is that an accurate statement?
7    A.  Correct.
8    Q.  Okay.  Were there any matters --
9    I am not going to call them "cases", but
10   matters other than those two where a
11   demand may have been made on a company in
12   your name for disgorgement of short-swing
13   profits?
14       MR. OSTRAGER:  Object.
15   A.  I don't recall.
16       THE WITNESS:  Okay.
17       MR. DOKSON:  What's the basis of
18   the objection, counsel?
19       MR. OSTRAGER:  I don't understand
20   the question.
21   Q.  Do you understand the question?
22   You answered it.
23   A.  Well, please restate it.
24       MR. DOKSON:  Would you read back
25   the question, please?

TSG Reporting - Worldwide    212-702-9580

Page 31

Segen

1
2    (The record was read.)
3    Q.  Do you understand that question,
4    sir?
5    A.  I believe I do.
6    Q.  Okay.
7    A.  I don't recall.
8    Q.  It could have been, but you are
9    not sure.
10   A.  I just have no recollection at
11   this time.
12   Q.  Would Mr. Ostrager or Mr. Wexler
13   have ever made a demand on a company for
14   disgorgement of short-swing profits in
15   your name as a shareholder without your
16   approval?
17   A.  I think you are asking me a
18   question that's way beyond my ability to
19   answer.
20       You know, I can just say that,
21   knowing the two individuals, you know, I
22   can vouch for them, that they would not.
23   Q.  To the best of your knowledge --
24   A.  But, nevertheless, I am not in a
25   position to answer that question, if you

TSG Reporting - Worldwide    212-702-9580

Page 32

Segen

1
2    are asking me about something that I don't
3    know.
4    Q.  If they did make such a demand,
5    and I am not suggesting they did, but if
6    they did make such a demand on a company
7    in your name without your knowledge or
8    approval, you would think that would be
9    wrongful; wouldn't you?
10   A.  I am not sure that what I think
11   matters.
12   Q.  I didn't ask you that.  Just
13   answer the question.
14       MR. OSTRAGER:  I will instruct
15   the witness, you can answer "Yes" or
16   "No" or, if you know the answer, you
17   can respond.
18   A.  I would be troubled by that,
19   yes.
20   Q.  You would.  You would think that
21   would be wrongful conduct?
22   A.  I said "I would be troubled by
23   that".
24   Q.  And why would you be troubled by
25   that?

TSG Reporting - Worldwide    212-702-9580

Page 33

Segen

1
2    A.  Uh -- because the proper -- as I
3    understand, the proper protocol, you know,
4    anything that's under my name I need to
5    authorize.
6    Q.  Would you need to authorize it
7    in writing or would an oral authorization
8    be okay?
9    A.  Oral would be sufficient, as far
10   as I am concerned.
11   Q.  You testified earlier that you
12   think there may have been a couple of
13   cases where at least demands were made,
14   you don't know if it went to the complaint
15   stage.  Do you remember the names of the
16   companies in those cases?
17   A.  I think -- perhaps I wasn't
18   clear, so thank you for giving me another
19   chance, but I was referring to the two cases
20   that we have been talking about that I
21   actually wasn't sure about whether, you
22   know, those cases had gone to the
23   complaint stage.
24   Q.  Right, that's what I was saying.
25   Let's call those, so we can talk --

TSG Reporting - Worldwide    212-702-9580

Page 34

Segen

1    Segen
2    A.  Call them "A" and "B".
3    Q.  Okay, we will call those "case
4  A" and "case B".
5    A.  Okay.
6    Q.  And we will call this case "case
7  C".
8    A.  But there is no other case, as
9  far as I can recall.
10    Q.  In case A, which may or may not
11  have gone to complaint, but you think
12  there was -- a demand may have been made,
13  do you recall the name of the company that
14  was at issue?
15    A.  Mmm -- not at this time.
16    Q.  Is there anything that would
17  refresh your recollection about that
18  company?
19    A.  Perhaps.
20    Q.  What would that be?
21    A.  You would have to show it to
22  me --
23    Q.  Show you what?
24    A.  -- in order for me to know
25  whether it would make me recall anything,
TSG Reporting - Worldwide   212-702-9580

Page 35

Segen

1    Segen
2  I would have to be shown a document.  Show
3  me -- you know, show me a document and we
4  will see whether it helps my recall.
5    Q.  How about case B, do you
6  remember the name of the Plaintiff in that
7  one?
8    A.  I don't recall at this time.
9    Q.  Now, in case A, which you don't
10  recall the name of it, do you recall that
11  you owned stock in the company when the
12  demand letter was sent?
13    A.  If I don't recall the case, I am
14  not sure, you know, how I can answer it.
15  But if you would tell me the name of the
16  company, I could definitely get you
17  confirmation from my broker as to whether
18  I had stock in it.  If that's acceptable
19  to -- you know, if it's acceptable to my
20  attorney.
21    MR. DOKSON:  Let's take a short
22  break.
23    (Recess taken: 11:29 a.m. -
24  11:36 a.m.)
25    MR. DOKSON:  Let's go back on
TSG Reporting - Worldwide   212-702-9580

Page 36

Segen

1    Segen
2  the record.
3    Q.  Okay, Mr. Segen.  Are you familiar
4  with a case of Segen versus CDR Cookie
5  Acquisition, LLC, Clayton Dubilier -- if
6  I'm pronouncing them -- Rice Fund VI
7  Limited Partnership, CDR Associates VI
8  Limited Partnership, and others?
9    A.  I don't recall that.
10    Q.  You don't recall that case
11  pending against Judge Sweet in the
12  Southern District of New York?
13    A.  I am not sure.
14    Q.  Did you authorize such a case to
15  be filed in your name?
16    A.  Anything that's been filed, I
17  have authorized.
18    Q.  But you don't remember anything
19  about it.
20    A.  I don't remember that specific
21  name.
22    Q.  Let me give you all the names,
23  maybe -- the Defendants are CDR Cookie
24  Acquisition, LLC, Clayton Dubilier and
25  Rice Fund VI L.P., CDR Associates VI LP,
TSG Reporting - Worldwide   212-702-9580

Page 37

Segen

1    Segen
2  CDR Investment Associates VI, Inc., and
3  Covansys, I think, C-O-V-A-N-S-Y-S, Corp.
4    A.  Yes, I know that word,
5  "Covansys" is the operative word.
6    Q.  Now that we have refreshed your
7  recollection with Covansys, what do you
8  remember about that case?
9    A.  I just remember it's a
10  securities case.
11    Q.  And who was the -- is that also
12  a short-swing profit case?
13    A.  I am not sure.
14    Q.  Who was the company whose
15  securities are at issue in that case?  Is
16  it Covansys?
17    A.  As far as I remember, Covansys.
18    Q.  You own Covansys stock?
19    A.  Yes.
20    Q.  Do you remember authorizing the
21  complaint to be filed?
22    A.  Yes.
23    Q.  Did you own the Covansys stock
24  at the time --
25    A.  Yes -- oh, sorry.
TSG Reporting - Worldwide   212-702-9580

Page 38

Segen

1
2    Q.  Did you own the Covansys stock
3  at the time it was filed?
4    A.  Definitely.
5    Q.  Was there a demand letter served
6  on Covansys before the complaint was
7  filed?
8    A.  I believe so.  But, you know, as
9  I sit here today, I can't really recall.
10    Q.  Did you ever see that demand
11  letter before it was sent?
12    A.  I believe so.
13    Q.  Did you own the stock at the time
14  the demand letter was sent?
15    A.  Yes.
16    Q.  How shortly before the demand
17  letter was sent did you purchase the stock
18  in Covansys?
19    A.  I can't recall.
20    Q.  Did you hold it for a long
21  period of time before or was it a relatively
22  short period?
23    A.  I can't recall.
24    Q.  Was it more than 50 years?
25    A.  (Smiling), no.
TSG Reporting - Worldwide   212-702-9580

Page 39

Segen

1
2    Q.  Was it more than ten years?
3    A.  No.
4    Q.  Was it more than a year?
5    A.  I don't know.
6    Q.  It could have been more than a
7  year?
8    A.  I can't recall.
9    Q.  Could have been?
10    A.  Could have been.
11    Q.  Where would the documents be
12  located that would indicate when you
13  purchased the Covansys stock?
14    A.  At my broker.
15    Q.  And who is your broker?
16    A.  Schwab.
17    Q.  Do you still own the Covansys
18  stock?
19    A.  I am not sure, but I believe so.
20    Q.  You believe so?
21    A.  Yeah.
22    Q.  What was the purpose in purchasing
23  the Covansys stock?
24    A.  Probably my usual motive, wanted
25  to make some money.
TSG Reporting - Worldwide   212-702-9580

Page 40

Segen

1
2    Q.  Was your usual motive to make
3  money as an -- invest in holding a stock
4  or as a plaintiff in a 16(b) suit?
5    A.  As an investor/trader.
6    Q.  Do I understand, then, that,
7  from that statement, that there was no
8  part of a motive in purchasing that stock
9  to be a plaintiff in a short-swing profit
10  suit?
11    A.  Correct.
12    Q.  Would it be fair to conclude
13  that, at the time you purchased that stock,
14  you didn't even have any idea that there
15  might be a short-swing profit claim to be
16  asserted?
17    A.  I don't recall.
18    Q.  When did you learn, in the
19  Covansys case, that there might be a
20  short-swing profit claim to be asserted?
21    A.  I don't recall when I found out.
22    Q.  How did you find out?
23      MR. OSTRAGER:  I would object,
24  only insofar as you are asking about
25  conversations that Mr. Segen may have
TSG Reporting - Worldwide   212-702-9580

Page 41

Segen

1
2  engaged in with counsel.  It's
3  privileged.  I don't object to him
4  identifying the fact that there may
5  have been conversations.
6      MR. DOKSON:  Okay.
7    Q.  How did you find out --
8    A.  I don't remember how I
9  originally found out, but I do know that I
10  had conversations with my attorney about
11  it.
12    Q.  I don't want you to tell me the
13  contents of those conversations but as you
14  know, as counsel, I am entitled to ask
15  certain things about the conversations
16  without getting into content.
17      Did you initiate the conversations
18  or did counsel?
19    A.  I don't remember.
20    Q.  Was anybody present when you had
21  any of those conversations, other than you
22  and counsel?
23    A.  I don't remember, but I don't
24  think so.
25    Q.  Now, you may have answered this,
TSG Reporting - Worldwide   212-702-9580

Page 42

Segen
1
2  but it's an important point, so I want to
3  get it clear. Did you purchase the stock
4  in Covansys before you learned of any
5  alleged short-swing profit claim?
6      A. I believe so, yes.
7      Q. You didn't go -- learn of the
8  claim and then go out and buy the stock;
9  is that correct?
10     A. It didn't have anything to do
11  with my purchase of the stock.
12     Q. I appreciate that, but that
13  wasn't quite the question. It may have
14  been the same answer. The question was,
15  you didn't learn about the short-swing --
16  the possible short-swing profit claim and
17  then go and buy the stock; is that
18  correct?
19     A. I don't recall, but I don't
20  believe so.
21     Q. Now, we were talking earlier
22  about other litigation cases, A and B, and
23  you said you weren't sure whether or not
24  those matters had actually gone even so
25  far as a complaint; is that correct?
       TSG Reporting - Worldwide   212-702-9580

Page 43

Segen
1
2      A. Correct.
3      Q. Okay, you just don't know.
4      A. I don't remember.
5      Q. You don't remember.
6      And if I give you the Civil
7  Action Number in the Covansys case, you
8  are still not sure whether there's been a
9  complaint filed?
10     A. It's -- the Civil Action Number
11  doesn't help me, the name helps me.
12     Q. Well, with the name, are you
13  aware that a complaint has been filed?
14     A. I believe so.
15     Q. Have you had any role at all in
16  that, other than being named as the
17  Plaintiff?
18     A. I don't understand the question.
19     Q. Have you been deposed?
20     A. No.
21     Q. Have you produced any documents?
22     A. No.
23     Q. Have you been requested to
24  produce any documents?
25     A. I don't recall being asked.
       TSG Reporting - Worldwide   212-702-9580

Page 44

Segen
1
2      Q. Have you reviewed any of the
3  motion papers?
4      A. I don't remember.
5      Q. You are not curious about reading
6  the briefs in a case where there are many
7  millions of dollars at stake?
8      A. Am I curious?
9      Q. Yes.
10     A. Not especially, no.
11     Q. Why did you agree to be
12  Plaintiff in the Covansys Corp. case?
13     A. Well, I am a former prosecutor
14  and, you know, I believe in enforcement of
15  the law.
16     Q. That's the only reason?
17     A. That's my primary reason.
18     Q. Are you aware, in the case
19  against -- this case, against ComVest and
20  Robert Priddy and other Defendants, that a
21  complaint's been filed?
22     A. Well, yeah, I am aware of it
23  as -- (indicating) -- yes, I am aware of
24  it as a result of being here.
25     Q. Were you aware of it before you
       TSG Reporting - Worldwide   212-702-9580

Page 45

Segen
1
2  were told that you had to come to a
3  deposition?
4      A. Yes, I was.
5      Q. How did you first become aware
6  of it?
7      A. I don't recall how I first
8  became aware.
9      Q. When did you first become aware
10  of it?
11     A. I don't recall.
12     MR. DOKSON: Let's mark this as
13  Priddy 1.
14     A. It was a while ago.
15     (Deposition Defendants' Exhibit
16  P.R. 1, Complaint, marked for
17  identification, as of this date.)
18     MR. OSTRAGER: Do you have a
19  copy for me?
20     MR. DOKSON: Yes.
21     Q. Mr. Segen, I show you a document
22  that's been marked Priddy Exhibit Number
23  1. Have you ever seen this document
24  before?
25     A. (Pause.)
       TSG Reporting - Worldwide   212-702-9580

Page 46

```
1              Segen
2          I not sure if I saw this exact
3  document.
4      Q.  Do you know what this document
5  is?
6      A.  Yes, I know what it is.
7      Q.  Can you tell me, for the record,
8  what you believe it is?
9      A.  I believe it's the Complaint in
10 the case of Leon Segen versus -- on behalf
11 of Intraware versus a whole bunch of
12 Defendants.
13     Q.  That's the complaint in the
14 litigation in which we are taking this
15 deposition now; is that correct?
16     A.  Correct.
17     Q.  And you are not sure if you have
18 seen this particular document before; is
19 that your testimony?
20     A.  I am saying I am not sure if I
21 have seen this particular one.  I may have
22 seen an earlier draft of it.  I can't
23 vouch for every word in here.
24     Q.  Do you recall seeing either this
25 document or some similar document, that
```

TSG Reporting - Worldwide   212-702-9580

Page 47

```
1              Segen
2  is, an earlier draft, before it was filed?
3      A.  Yes.
4      Q.  Do you have copies of any of the
5  documents that you, in fact, were shown?
6  Whether it's the complaint or an earlier
7  draft.
8      A.  I am not sure.
9      Q.  How would you find out the
10 answer to that?
11     A.  I would have to do a search of
12 my records.
13     Q.  And where are those records
14 located?
15     A.  Well, these records would
16 probably be in my office.
17     Q.  And where would they be in your
18 office?
19         Do you have a separate file on
20 the Segen versus ComVest Venture Partners,
21 et cetera, lawsuit?
22     A.  I really don't -- I don't
23 remember if I set up a separate file for
24 it.
25     Q.  Well, if you were going to look
```

TSG Reporting - Worldwide   212-702-9580

Page 48

```
1              Segen
2  for those papers, where would you look?
3      A.  I would look in my filing
4  cabinet.
5      Q.  Under what category or under
6  what letter?  How would you find it?
7      A.  In alphabetical order, under
8  Intraware.
9      Q.  So, do you have a separate
10 Intraware file in your --
11     A.  I don't know.
12     Q.  Do you have a separate
13 Covansys - is that how you say it -- file
14 in your office?
15     A.  I don't know.
16     Q.  Do you have a secretary?  Or,
17 these days, we call them "assistant".
18     A.  Not full time, no.
19     Q.  Part-time?
20     A.  Yeah.
21     Q.  What's her name -- his name, her
22 name or his name, I didn't want to be
23 sexist.
24     A.  Sylvia.
25     Q.  What's Sylvia's last name,
```

TSG Reporting - Worldwide   212-702-9580

Page 49

```
1              Segen
2  please?
3      A.  I don't know.
4      Q.  Do you pay her?
5      A.  No.
6      Q.  Who pays her?
7      A.  Uh -- another one of our
8  lawyers.
9      Q.  Do you share space?
10     A.  Yes.
11     Q.  Who is the other lawyer?
12     A.  Jeff Platt.
13     Q.  Jeff Platt?
14     A.  Yeah.
15     Q.  At the same address?
16     A.  Yes.
17     Q.  So Sylvia is his assistant and
18 you buy time, or something of that nature?
19     A.  No.  She's -- we use her as we
20 see fit.
21     Q.  Does she maintain your files --
22     A.  No.
23     Q.  -- and do filing for you?
24     A.  No.  I don't use her for that
25 purpose.
```

TSG Reporting - Worldwide   212-702-9580

Page 50

```
 1              Segen
 2     Q.  So, if files are maintained by
 3  you, you do that yourself.
 4     A.  Correct.
 5     Q.  And you are sitting here today,
 6  under oath, and you are saying you don't
 7  know if you have a Covansys file or an
 8  Intraware file.
 9     A.  Correct.
10     Q.  You just can't remember.
11     A.  I don't think I have a separate
12  file for it, but I don't remember.  I
13  don't think I retained any of these
14  papers.
15     Q.  So you --
16     A.  But -- I might have on some
17  occasion, but that's not my practice.
18     Q.  So if you saw an earlier draft
19  or the final complaint before it was
20  filed, you would have gotten it and you
21  think you then would just toss it.
22     A.  I probably would not have
23  retained it.
24     Q.  Did you review the complaint or
25  the earlier draft to see that everything
```
TSG Reporting - Worldwide    212-702-9580

Page 51

```
 1              Segen
 2  was factually correct?
 3     A.  To the best of my ability.
 4     Q.  Because you know, as a
 5  litigator, you want to make sure that
 6  nothing's filed in your name that isn't
 7  correct, as far as you know; is that a
 8  fair statement?
 9     A.  To the extent that it has to do
10  with my participation, yes.
11     Q.  Well, is there anybody else who
12  is a Plaintiff in the Intraware case,
13  except you, and of course derivatively on
14  behalf of Intraware?
15     A.  No.
16     Q.  So when you say your
17  participation --
18     A.  That's not the way I mean it.  I
19  mean in terms of my actions.  There is not
20  much here that has anything to do with
21  anything that I was involved in, or that I
22  know of.
23     Q.  Look, if you would, please, sir,
24  in Exhibit 1, on pages 12 and 13.  I'm
25  sorry, strike that.
```
TSG Reporting - Worldwide    212-702-9580

Page 52

```
 1              Segen
 2     Do you understand the essence of
 3  a short-swing profit claim?
 4     A.  I believe I do.
 5     Q.  Okay, tell me what you
 6  understand to be the essence of that
 7  claim.
 8     A.  I believe that insiders have
 9  certain rules and regulations regarding
10  the purchase and sale of stock in which
11  they are insiders, and that they are
12  legally obligated to hold on to the shares
13  that they have bought for a certain period
14  of time, and if they sell it before that
15  period of time then they have committed an
16  offense against the securities section
17  16(b).
18     Q.  And what is that period of time?
19     A.  You know, I am not sure, but --
20  I believe it's 30 days that it has to be
21  held for.
22     Q.  Is it your understanding, then,
23  that there has to be a -- what we call
24  "matching transactions", as first a
25  purchase and then a sale and within the --
```
TSG Reporting - Worldwide    212-702-9580

Page 53

```
 1              Segen
 2  before the time period?
 3     A.  I think you are beyond my legal
 4  expertise on this matter, you know, when
 5  you go that far.
 6        I just know that they have to
 7  hold on to their stock for a certain
 8  period of time.
 9     Q.  After they purchase it?
10     A.  Yeah, and I believe it's 30
11  days.
12        Whether it's for all shares, I
13  am not sure.
14     Q.  Okay.  So, but there has to be
15  a -- in order for there to be 16(b)
16  liability, there has to be a purchase and
17  then a sale in a shorter time than the law
18  permits; is that your understanding?
19     A.  Basically.
20     Q.  So you have to match the
21  purchase and then the sale.
22     A.  I wouldn't opine on that.
23     Q.  Take a look, if you would,
24  please, sir, at paragraph 31.  I would
25  like you to read paragraph 31 to yourself.
```
TSG Reporting - Worldwide    212-702-9580

Page 54

Segen

1
2      It's about a page long, starts in the
3      middle of page 12 and runs through the
4      middle of page 13.
5          A.   Starting in paragraph 31?
6          Q.   Yes, 31.
7          A.   From 31 to the First Claim for
8      Relief?
9          Q.   Yes.
10         A.   (Pause.)
11             Okay.
12         Q.   Now, focusing first on 31(a),
13     you, as the Plaintiff, in this lawsuit,
14     are contending that ComVest had one
15     transaction on November 9, 2001 which is
16     matchable with an earlier transaction; is
17     that correct?
18         A.   Yes.
19         Q.   And then, in 31(b), you are
20     contending that -- you, as the Plaintiff,
21     are contending, that Mr. Priddy had 13
22     separate transactions that would lead to
23     disgorgeable profits under 16(b); is that
24     correct?
25         A.   Apparently.
TSG Reporting - Worldwide    212-702-9580

Page 55

Segen

1
2          Q.   Pardon me?
3          A.   Apparently.
4          Q.   I mean, you can read this as a
5      lawyer.
6          A.   No, I am not reading this as a
7      lawyer, I am reading this --
8              MR. OSTRAGER:  I think the
9          witness should testify.  I would
10         object insofar as you are asking the
11         witness to read documents and
12         formulate legal opinions.  The
13         witness is here to answer based upon
14         his personal knowledge, and if this
15         document refreshes his recollection
16         about his personal knowledge, then he
17         can testify about that recollection.
18             MR. DOKSON:  Objection is noted.
19         Q.   These are the only transactions,
20     the one for ComVest, the 13 for
21     Mr. Priddy, that you, as the Plaintiff,
22     contend violate 16(b) and as to which
23     profits should be disgorged; isn't that
24     correct?
25         A.   I don't recall.
TSG Reporting - Worldwide    212-702-9580

Page 56

Segen

1
2          Q.   Are you aware of any others?
3          A.   I am not aware of -- you know,
4      if these are all of the ones that are
5      alleged.
6          Q.   Where else would any others have
7      been alleged?
8          A.   I don't know.
9              You know, I haven't re-read the
10     entire complaint nor do I especially think
11     I need to, but --
12             MR. OSTRAGER:  You can just
13         answer as to your personal knowledge.
14         A.   I don't know.
15         Q.   If you read the entire
16     complaint, would that help you answer it?
17         A.   Probably not.  I don't think it
18     would, but it might.
19         Q.   Okay.  Why don't you read it.
20     Let's take a little break, and you will
21     read it.
22         A.   (Pause.)
23             Okay, I am ready.  I can't tell,
24     it's too complex for me.
25         Q.   Who would know the information
TSG Reporting - Worldwide    212-702-9580

Page 57

Segen

1
2      as to whether or not there were any other
3      transactions besides these that are listed
4      here that might be subject to disgorgement
5      under 16(b)?
6          A.   I don't know.  I don't know who
7      might know.
8          Q.   Would your counsel know?
9          A.   I don't know, but he might.
10         Q.   Now, you would agree with me,
11     would you not, that the allegations in
12     paragraph 31, both (a) and (b), do show
13     the details regarding the claimed
14     insiders; is that correct?
15         A.   I don't know.
16             MR. OSTRAGER:  I would object
17         insofar as the witness has not so
18         testified.
19             MR. DOKSON:  Objection is noted.
20         Q.   You don't know, reading
21     paragraph 31, whether or not it identifies
22     the claimed insider?
23         A.   Whether it identifies the
24     claimed insider?
25         Q.   Yes, the insider's name?
TSG Reporting - Worldwide    212-702-9580

Page 58

Segen

1
2    MR. OSTRAGER: Do you understand --
3    I would ask -- I would object insofar
4    as it's not clear the witness understands
5    your question.
6    MR. DOKSON: Well, he hasn't said
7    he doesn't understand.
8    MR. OSTRAGER: I don't understand
9    it.
10   Q.  Do you understand the question,
11   sir?
12   A.  No.
13   Q.  Does paragraph 31(a) identify
14   the name of the claimed insider whose
15   profits should be disgorged?
16   MR. OSTRAGER: You can testify,
17   if you know.
18   A.  I don't know.
19   Q.  Okay. Mr. Segen, where did you
20   grad-- I know the school that you
21   graduated from, what was your class
22   ranking, sir?
23   MR. OSTRAGER: I would object.
24   I think that borders on harassment
25   insofar as --

TSG Reporting - Worldwide    212-702-9580

Page 59

Segen

1
2    MR. DOKSON: Objection is noted.
3    MR. OSTRAGER: -- personally
4    attacking the witness.
5    MR. DOKSON: I am not attacking
6    your witness at all.
7    MR. OSTRAGER: I will instruct
8    him not to answer that question.
9    (DIRECTION NOT TO ANSWER.)
10   Q.  Are you refusing to answer the
11   question?
12   A.  I would abide by my attorney's
13   instruction.
14   Q.  Look at paragraph 31(a). It
15   says: "ComVest sold 200,000 shares".
16   Do you see that?
17   A.  Yes, I see it.
18   Q.  Look back at the first page,
19   paragraph 3. Defendant ComVest Venture
20   Partners, LP is then identified as
21   "ComVest" as a defined term.
22   Do you see that?
23   A.  Yeah.
24   Q.  Now, my question again to you,
25   sir, is, looking at those two, does

TSG Reporting - Worldwide    212-702-9580

Page 60

Segen

1
2    paragraph 31(a) tell you the name of the
3    insider whose profits you are claiming
4    should be disgorged?
5    A.  It's a legal conclusion, and
6    this is not my area of law, I can't tell
7    you that.
8    Q.  Okay. You are sitting here,
9    under oath, and saying you can't tell me
10   whether 31(a) tells the name of the
11   insider whose profits should be disgorged?
12   A.  I think you are asking me to,
13   you know, reach a legal conclusion and,
14   you know, I am not sure. It looks like
15   it, perhaps, I believe so, but I don't
16   know for a legal fact that that's
17   accurate.
18   Q.  Does paragraph 31(a) tell us the
19   date of the transaction as to which
20   profits should be disgorged?
21   A.  Uh -- you know, you are using
22   all sorts of legal terms that are beyond
23   my level of expertise. I can't answer
24   that question, the way it's been phrased.
25   Q.  Well, you told me earlier that

TSG Reporting - Worldwide    212-702-9580

Page 61

Segen

1
2    there had to be a purchase, then a sale.
3    Do you remember that testimony?
4    A.  Yeah, but I didn't say anything
5    about "matching", nor did I say anything
6    about "disgorgement", I didn't use any of
7    those terms.
8    MR. OSTRAGER: Don't engage in a
9    dialogue.
10   You can ask a question, sir, and
11   the witness can answer, if he has
12   personal knowledge of it or if he
13   understands your question.
14   Q.  So you don't understand the
15   term, in 31(a), "is matchable with the
16   purchase on August 31, 2001", you just
17   don't understand that.
18   A.  I am not sure.
19   Q.  Did you ever take a course in
20   securities in law school?
21   A.  Yeah, a long time ago.
22   Q.  Have you ever read Section 16(b)
23   of the Securities Act?
24   A.  I may have.
25   Q.  You don't remember?

TSG Reporting - Worldwide    212-702-9580

Page 62

Segen
1
2    A.  I don't recall.
3    Q.  You would agree with me, would
4  you not, that 31(a) tells the number of
5  shares that were, in fact, sold on
6  November 9, 2001; wouldn't you?
7    A.  It appears to.
8    Q.  And it also tells the name of
9  the person who -- or entity who sold those
10  shares; wouldn't it?
11    A.  It appears to.
12    Q.  It shows the dates on which
13  those shares were sold; doesn't it?
14    A.  It alleges that, yes.
15    Q.  And it shows the price at which
16  those shares were sold; doesn't it?
17    A.  Apparently.
18    Q.  And if we looked at 31(b), then,
19  with regard to the 13 transactions for
20  Mr. Priddy, paragraph 31 tells us the name
21  of the person who sold the shares at
22  issue; doesn't it?
23    A.  It appears to.
24    Q.  Robert Priddy; right?
25    A.  It appears to, yeah.
TSG Reporting - Worldwide   212-702-9580

Page 63

Segen
1
2    Q.  And that's who you are suing --
3  one of the parties you are suing here;
4  right?
5    A.  Apparently.
6    Q.  And it shows the date of each
7  transaction that you have raised an issue
8  about; doesn't it?
9    A.  It shows a bunch of dates.
10    Q.  From November 19th, 2001 through
11  January 31st, 2002; right?
12    A.  That's what it says.
13    Q.  And it shows the number of
14  shares with respect to each such transaction;
15  doesn't it?
16    A.  It appears to, but I have no
17  recollection of any of this, as I sit here
18  today.
19    Q.  And it shows the price per share
20  as to each such transaction; doesn't it?
21    A.  You know, why don't you just put
22  it into evidence.
23      All I can do, I am just reading
24  it.  I mean, I don't have -- as I sit here
25  today, I have no recall about any of these
TSG Reporting - Worldwide   212-702-9580

Page 64

Segen
1
2  trades by Mr. Priddy, and all I am doing
3  is, you know, reading back what you are
4  telling me.
5      MR. OSTRAGER:  I instruct the
6      witness, just answer the question, we
7      don't have to engage in a dialogue.
8    Q.  I am trying to find out what you
9  know and, if you don't know it, who knew
10  it, Mr. Segen.  You understand that as a
11  litigator?
12    A.  Yeah, but -- okay, go right
13  ahead.
14    Q.  Okay.  So the answer is "yes",
15  paragraph 31 shows the insider's name, the
16  date of each transaction, the number of
17  shares, and the price per share as to each
18  transaction.
19    A.  That's what it says.
20    Q.  Correct?  And your testimony is
21  you don't have independent recollection of
22  having knowledge of these transactions.
23    A.  I don't have any recollection at
24  this time --
25    Q.  Okay.
TSG Reporting - Worldwide   212-702-9580

Page 65

Segen
1
2    A.  -- about these transactions.
3    Q.  Would it be fair to say you
4  don't know if you ever had that knowledge?
5    A.  Uh -- I believe I did, but I am
6  not sure.
7    Q.  Okay.  How did you gain that
8  knowledge?
9      MR. OSTRAGER:  I would object.
10      I would instruct the witness not to
11      answer insofar as his answer requires
12      disclosure of attorney/client
13      communications.
14      (DIRECTION NOT TO ANSWER.)
15    Q.  Can you answer the question?
16    A.  I can't recall any other basis.
17    Q.  So do you -- okay.  Don't put
18  that away.
19      MR. DOKSON:  This will be Priddy
20      5.
21      (Deposition Defendants' Exhibit
22      P.R. 5, letter, dated July 5, 2002,
23      to Board of Directors, Intraware,
24      Inc, from Glenn E. Ostrager, marked
25      for identification, as of this date.)
TSG Reporting - Worldwide   212-702-9580

Page 66

Segen

1
2    MR. OSTRAGER: Do you have a
3    copy for me?
4    MR. DOKSON: Yes.
5    MR. OSTRAGER: Thank you.
6    Q. Let me show you a document that
7    we have now labelled as Priddy Exhibit 5.
8    Have you ever seen that document before?
9    A. I believe so.
10   Q. Do you recall when you first saw
11   it?
12   A. No.
13   Q. Do you recall if you saw it or a
14   draft prior to the time that it was sent?
15   A. I believe so, but I really
16   wouldn't know. I can't remember the
17   dates.
18   Q. Would this document be in your
19   Intraware file, if you have one?
20   A. I doubt it. And I don't believe
21   have an Intraware file.
22   Q. How about, do you have a
23   computer?
24   A. Yes.
25   Q. Okay. Do you have a file on

Page 67

Segen

1
2    your computer with anything having to do
3    with this lawsuit or Intraware?
4    A. I doubt it. I don't believe so.
5    Q. You are not sure of that,
6    though.
7    A. I am fairly sure.
8    Q. Who would know that besides you?
9    A. Nobody.
10   Q. Anybody else have access to
11   your --
12   A. No.
13   Q. -- computer.
14   And nobody else has access to
15   your hard copy files?
16   A. No.
17   Q. Is there anything that would
18   refresh your recollection as to whether or
19   not you saw this document before July 5th,
20   2002?
21   A. I don't know.
22   Q. Okay.
23   A. But I know I did authorize this
24   letter.
25   MR. OSTRAGER: I instruct the

Page 68

Segen

1
2    witness, just answer the question.
3    THE WITNESS: Stop.
4    MR. DOKSON: That's okay, he
5    anticipated, that was the next
6    question.
7    Q. Now, you say you did authorize
8    this letter. Do you mean you authorized
9    sending a demand letter to Intraware or do
10   you mean that you authorized and approved
11   this letter or a draft of this particular
12   letter?
13   Do you understand the
14   distinction?
15   A. What I remember is, I remember
16   having conversations with my attorney
17   about a demand letter and the general
18   contents that were going to be in that
19   letter.
20   Q. And you authorized on your
21   behalf the sending of such a letter?
22   A. Correct.
23   Q. But you don't recall, when you
24   had those conversations, whether in fact
25   you saw the actual letter to be sent or a

Page 69

Segen

1
2    reasonable copy thereof, a draft?
3    A. I saw it contemporaneously with
4    those conversations, whenever they were.
5    Q. So that would have to be, then,
6    before the letter was sent.
7    A. I wouldn't know. I can't draw
8    that conclusion, but I assume that to be
9    the case.
10   Q. I mean -- well, let's just parse
11   that a little bit.
12   You couldn't have authorized it
13   unless it were -- the conversation was
14   before it was sent. You could have
15   ratified the sending, but you couldn't
16   have authorized it unless you had the
17   conversation before the letter was sent;
18   isn't that correct?
19   A. Uh -- I am not sure if that's
20   correct.
21   Q. How could you -- maybe I am
22   missing something, Mr. Segen -- how could
23   you authorize somebody to do something if
24   it was already done?
25   A. Well, I could have given some

Page 70

```
          Segen
 1
 2   prior permission before having read it and
 3   before having discussed the specifics. I
 4   don't recall.
 5       Q.  I understand.
 6           Now, look, if you would, please,
 7   sir, starting at page 3, the second
 8   paragraph, and then reading down through
 9   the -- what I will call "the grid", the
10   list of transactions, until you get to the
11   "Accordingly".
12           Do you see that?
13       A.  Yeah.
14       Q.  Compare that with the
15   allegations of paragraph 31, (a) and (b).
16       A.  (Pause.)
17           Okay.
18       Q.  Those reference exactly the same
19   transactions in both documents; don't
20   they?
21       A.  They appear to be the same.
22       Q.  Not "they appear to be", they
23   are in fact the same in the documents;
24   aren't they?
25           Look at each one.
```
TSG Reporting - Worldwide   212-702-9580

Page 71

```
          Segen
 1
 2       A.  (Pause.)
 3           They appear to be the same.
 4       Q.  Okay.  And Ostrager Chong &
 5   Flaherty sent the letter, which is Priddy
 6   5, as your counsel; is that correct?
 7       A.  Yes.
 8       Q.  Okay.  When did they begin
 9   representing you on this matter, do you
10   know?
11       A.  I don't recall.
12       Q.  Is there any documentation that
13   would show that?
14       A.  I don't know.
15       Q.  Do you have any kind of written
16   retainer agreement between you and either
17   Glenn Ostrager's firm (indicating Mr. Ostrager)
18   or Paul Wexler's firm with regard to this
19   litigation?
20       A.  I don't believe so.
21       Q.  Have you ever had any written
22   either retainer letter or letter of
23   authorization, or anything of that nature?
24       A.  Regarding this matter?
25       Q.  Yes.
```
TSG Reporting - Worldwide   212-702-9580

Page 72

```
          Segen
 1
 2       A.  I don't believe so.
 3       Q.  When did Mr. Ostrager's firm
 4   ever start representing you on any
 5   matters?
 6           Is this the first time?
 7       A.  I don't believe so.
 8       Q.  When did they first become your
 9   counsel on any matters?
10       A.  I don't remember when.
11       Q.  But it would be (indicating)
12   before July 5th, 2002?
13       A.  I believe so, yes.
14       Q.  Would it be before 1990?
15       A.  I don't believe so.
16       Q.  Before 1995?
17       A.  I don't believe so.
18       Q.  Before 2000?
19       A.  I am not sure.
20       Q.  Do you have any documentation
21   that would tell when that was?
22       A.  I don't believe so.
23       Q.  Do you think they would have
24   documentation?
25       A.  I don't know.
```
TSG Reporting - Worldwide   212-702-9580

Page 73

```
          Segen
 1
 2       Q.  Have you ever paid any fees or
 3   expenses to this law firm?
 4       A.  No.
 5       Q.  Have you ever been asked to pay
 6   any fees or expenses?
 7       A.  No.
 8       Q.  Do you have -- I'm sorry, strike
 9   that.  Let me go back.
10           How about Mr. Wexler's firm,
11   have you ever paid any fees --
12       A.  No.
13       Q.  -- or expenses to that firm?
14       A.  No.
15       Q.  Have you ever been asked to?
16       A.  I don't believe so.
17       Q.  Do you have any relationship,
18   other than the attorney/client relationship,
19   with anyone affiliated with Mr. Ostrager's
20   law firm?
21       A.  Do I have a relationship?
22       Q.  Other than the attorney/client
23   relationship.  Are you related, you know,
24   in a familial way?
25       A.  No, not related in a familial
```
TSG Reporting - Worldwide   212-702-9580

Page 74

```
1              Segen
2   way.
3       Q.  Are you personal friends?
4       A.  I have known Mr. Ostrager.
5       Q.  How did you first come to know
6   Mr. Ostrager?
7       A.  I don't remember, but I think it
8   was -- I was teaching a class in legal
9   history.
10      Q.  Back at Stony Brook?
11      A.  Yeah.
12      Q.  He was a student?
13      A.  At that time.
14      Q.  Do you have any relationship,
15  other than attorney/client relationship,
16  with anyone at Mr. Wexler's firm?
17      A.  No.
18      Q.  How did you first come to know
19  Mr. Wexler?
20          Was that through Mr. Ostrager?
21      A.  Mr. Ostrager.
22      Q.  The date of the -- what I will
23  call "the demand letter", Priddy Number 5,
24  is July 5th, 2002. ; is that correct?
25      A.  Correct.
       TSG Reporting - Worldwide   212-702-9580
```

Page 75

```
1              Segen
2       Q.  When did you learn the
3   information that is contained in paragraph
4   3 regarding the transactions?  That is,
5   the information in the two paragraphs
6   beginning "On November 9th, 2001" --
7       A.  Where are you reading from now?
8       Q.  Page 3 of the letter --
9       A.  Mm-hmm, regarding these --
10      Q.  Priddy transactions.
11      A.  "Priddy engaged in the following
12  trades:"
13      Q.  "Priddy" -- and, also, the
14  paragraph before.
15          MR. OSTRAGER:  I instruct the
16  witness not to answer insofar as it
17  would require testimony regarding
18  privileged communications, counsel.
19          MR. DOKSON:  The question
20  "when", counsel, the question when
21  could not involve privileged
22  communications.  The "how" maybe but
23  the "when" does not.
24          MR. OSTRAGER:  I just instructed
25  the witness to be mindful of
       TSG Reporting - Worldwide   212-702-9580
```

Page 76

```
1              Segen
2   attorney/client privilege issues.
3       A.  I don't remember.
4       Q.  Now, you testified earlier that
5   you did authorize the sending of this
6   letter, even conceptually, before the
7   letter was sent; is that correct?
8       A.  I --
9           MR. OSTRAGER:  I object to your
10  characterization of the witness's
11  testimony, the record speaks for
12  itself.
13          MR. DOKSON:  The objection is
14  noted.
15      Q.  Please answer the question, sir.
16      A.  I believe so.
17      Q.  How soon before the letter was
18  sent did you have that conversation?
19      A.  I have no recollection.
20      Q.  Was it more than ten minutes
21  before?
22          MR. OSTRAGER:  I would object --
23      A.  I have no recollection.
24          MR. OSTRAGER:  -- because the
25  witness testified he has no
       TSG Reporting - Worldwide   212-702-9580
```

Page 77

```
1              Segen
2   recollection.
3       A.  I have no recollection of the
4   date July 5th, 2002 or the time before
5   that, I just don't recall.
6       Q.  Could it have been as much as
7   six months before?
8           MR. OSTRAGER:  Instruct the
9   witness not to speculate.  You can
10  answer as to your personal knowledge.
11      A.  I have no way of being able to
12  answer it.
13      Q.  So you could have learned of
14  these transactions as much as six months
15  ago or as short as one day before this
16  letter was sent?
17          MR. OSTRAGER:  I would object to
18  the question insofar as it calls for
19  speculation.  The witness can testify
20  as to his personal knowledge and
21  recollection.
22          MR. DOKSON:  The objection is
23  noted.
24      A.  I just don't recall.
25          July 5th, 2002, the date of the
       TSG Reporting - Worldwide   212-702-9580
```